IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**UNITED STATES OF AMERICA**,

v.

**WILLIAM ROSADO-CANCEL**, *et al.*,

Defendants.

Criminal No. 13-0731 (DRD/BJM)

### REPORT AND RECOMMENDATION

Defendants William Rosado- Cancel ("Rosado") and Juan Antonio Rosario-Cintron ("Rosario") were charged with possession of a machinegun, in violation of 18 U.S.C. § 922(o), and possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. § 922(k). Docket No. 13. Rosario moved to exclude, on both evidentiary and constitutional grounds, the two firearms at the heart of the charged offenses. Docket No. 49 ("Mot."). The matter was referred to me for a report and recommendation. Docket Nos. 50, 51. The government opposed the motion, Docket No. 56 ("Opp."), and Rosario replied, Docket No. 57. Rosado joined Rosario's motion. Docket Nos. 58, 59. For the following reasons, the motion should be **denied**.

### BACKGROUND

On the afternoon of September 28, 2013, defendants allegedly threw two firearms out the window of a green Toyota Yaris while fleeing from police on Road 187 in Loiza, Puerto Rico. According to the affidavit accompanying the government's criminal complaint, Docket No. 1-1, officers ordered the car to pull over after clocking it going over the speed limit; it came to a stop initially but took off again as an officer approached on foot. During the ensuing chase, the officer in pursuit saw a man in the Yaris's rear passenger seat throw two guns out the window. When the chase eventually came to an end, police found three people in the Yaris, including Rosario and Rosado, who was in the rear passenger seat; a third person was driving. Two guns were subsequently found and seized by the police: a Smith & Wesson ("S&W") .45-caliber Model 4516-1 with an obliterated serial number and a

United States v. Rosado-Cancel, Criminal No. 13-0731 (DRD/BJM)                                        2

Glock .357-caliber Model 31, serial number SEH847, with an attached modification converting it into a machinegun. The affidavit does not specify where the two guns were discovered.

      Defendants anticipate that at trial the government will attempt to introduce the two firearms into evidence. The government will claim, defendants presume, that those two firearms were the very guns that the police saw discarded during the chase. Defendants, however, are not so sure that the government will be able to show that the two seized firearms are those allegedly thrown from the Yaris. They point to two seemingly contradictory materials provided by the government in discovery. The first is a photograph of kilometer marker 16 along Road 187, representative, defendants say, of the location where the guns were allegedly discarded during the chase. Mot ¶ 4; Docket No. 49-2. The second is a forensic report documenting a ballistics analysis of the firearms, along with spent bullets and shell casings. Mot. ¶ 5; Docket No. 62-1. The report lists the evidence analyzed, including the guns, as "collected at" a specific address: Calle 4 Parcella 99, San Isidro Canovanas. Mot. ¶ 6; Docket No. 62-1. This, of course, is a location different from the area along Road 187 where the photograph, as defendants see it, suggests the guns were tossed; defendants say the two places are more than four miles apart. Mot. ¶ 11.

      According to the government, the address listed on the report is the scene of a murder where the bullets and casings mentioned in the report were discovered. Opp. 1–2. The firearms, which the government says were found "away from the murder scene," were analyzed against the bullets and casings, and the analysis revealed a match. *Id.* at 1. The government does not explain the discrepancy highlighted by defendants, noting only that the bullets and casings were in fact seized from that location. *Id.* at 1–2.

## DISCUSSION

      Defendants present two grounds for exclusion. They first argue that the firearms cannot be authenticated under Federal Rule of Evidence ("Rule") 901 and are therefore inadmissible. Second, they argue that there are concerns about the reliability of the firearms

so significant that admission of the firearms would constitute an affront to due process.

The government argues in response that, notwithstanding the apparent inaccuracy of the forensic report, the firearms will be duly authenticated at trial. Specifically, the government proffers that it will establish authenticity by introducing (1) a statement by Rosario that on September 28, 2013, he was involved in a murder where the bullets and casings were found and fled the scene by car; (2) testimony of the police officers who observed the two seized firearms being thrown from the window of the Yaris; and (3) results of the ballistics analysis connecting the firearms to the bullets and casings at the murder scene. Beyond dismissing as meritless the claim that there are grave doubts about the firearms' reliability, the government does not address defendants' due process argument.

**I.      Authentication**

Before nontestimonial evidence may be admitted at trial, its proponent "must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). At bottom, authenticity is "a special aspect of relevancy"; until the requisite showing is made that a proffered item is what it is purported to be, the item is irrelevant. *Id.* advisory committee's note; 31 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure § 7103 (1st ed. 2000). Authentication is therefore treated as a matter of "conditional relevancy" governed by Rule 104(b). Fed. R. Evid. 901(a) advisory committee's note. The question of authenticity is ultimately one for the jury, and the court must determine only whether the jury could reasonably find the proffered evidence authentic. The court "stands as a sentinel at the gates. If in the court's judgment it seems reasonably probable that the evidence is what it purports to be, the command of Rule 901(a) is satisfied, and the evidence's persuasive force is left to the jury." *United States v. Ladd*, 885 F.2d 954, 956 (1st Cir. 1989). Evidence may be admitted conditionally, subject to the introduction of adequate proof at a later time. Fed. R. Evid. 104(b).

The government will at trial presumably seek to introduce two guns into evidence, claiming that they are the very two guns that defendants discarded along Road 187 during

the chase on September 28, 2013. Their relevance depends on whether they are, in fact, the same guns, in the same condition as when discovered; this is what the government must show to authenticate them. The question is whether the government can make that showing given the forensic report's alleged misstatement of where the guns were seized, a question that may be separated into two parts. First, what must the government show? Second, can it be shown despite the forensic report?

The nature of the necessary showing depends on the nature of the offered evidence. "[E]vidence . . . is properly admitted if it is readily identifiable by a unique feature or other identifying mark. On the other hand, if [it] . . . is not readily identifiable or is susceptible to alteration, a testimonial tracing of the chain of custody is necessary." *United States v. Abreu*, 952 F.2d 1458, 1467 (1st Cir. 1992). Defendants correctly characterize the inaccurate forensic report as presenting an "issue[] with the chain of custody," Mot. ¶ 9. That is, the report is potentially problematic only if the government endeavors to authenticate the guns by providing a "testimonial tracing of the chain of custody." In that case, the government will present evidence as to where the guns were found and seized, and defendants will attempt to counter that evidence by presenting the report's contradictory story in some admissible form.[1]

Defendants apparently assume that a tracing of the chain of custody is required here, but if the government is able to authenticate the guns in some other way, the report is likely a non-issue. *See United States v. Morales*, No. 95-1616, slip op. at 3 (1st Cir. July 12, 1996) (unpublished); *Abreu*, 952 F.2d at 1468–69. In *Abreu*, the First Circuit rejected the defendant's argument that admission of a shotgun was improper because the officer who seized it misidentified its manufacturer in his testimony, calling into doubt the integrity of the initial link in the chain of custody. 952 F.2d at 1468–69. The discrepancy was irrelevant, the court held, because the shotgun had already been duly authenticated by the

---

[1] Though the government has not yet stated precisely where it claims the guns were found, it has acknowledged that they were not seized at the murder scene. Opp. 1. Whatever chain-of-custody evidence the government presents will, then, necessarily conflict with the report to some degree.

officer's testimony that he recognized the gun from the evidence tag he placed upon it at the time of seizure. *Id.* at 1469. Similarly, in *Morales*, the defendant pointed to inconsistencies in the testimony of two detectives regarding the circumstances of a handgun's seizure and to the lack of an evidence tag on the handgun. *Morales*, No. 95-1616, slip op. at 3 (1st Cir. July 12, 1996) (unpublished). The court treated these chain-of-custody concerns as inconsequential, holding that the handgun had been properly authenticated based on testimony that it bore the same serial number as the gun seized, that it was the same gun, and that it was in the same condition. *Id.*

The government believes it can authenticate the guns without getting into the chain of custody. It proposes to do so not in the conventional way, by adducing testimony about their distinctive superficial features or identifying marks, *see, e.g.*, *United States v. Luna*, 649 F.3d 91, 103 (1st Cir. 2011) (officers testified that they recognized a revolver based on its brown handle and the fact that revolvers were very rare on the streets); *Abreu*, 952 F.2d at 1468–69, but rather through forensic and other circumstantial evidence tying the guns to Rosario and the Yaris.[2] *See* Fed. R. Evid. 901(b)(4) (providing that evidence may be authenticated based on the "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances"); s*ee Luna*, 649 F.3d at 103–104 (finding ammunition authenticated based on a ballistics examination that determined it was fired from a gun previously authenticated as one the defendant had when arrested).

I find that the government's proposed evidence is, without more, insufficient to authenticate the guns. The proffered evidence does, however, go a long way toward establishing authenticity: it is sufficient to support a finding that it is "reasonably probable," *Ladd*, 885 F.2d at 956, that on the date in question Rosario had two guns in his possession before discarding them along Road 187. Rosario's statement to police places him at the

---

[2] If the government is able to authenticate the guns by showing their connection to Rosario, the guns will also be authenticated as against Rosado. *See* 31 Wright & Gold, *supra*, § 7104 ("Once evidence offered against one party is deemed authentic, its authenticity is established as against all other parties as well.").

murder scene; two guns are also placed at the scene by the evidence that they match bullets and casings found there. Those two pieces of evidence, considered together, support an inference that Rosario was in possession of at least one of the two guns at the murder scene. This inference is strengthened and extended by the further evidence that Rosario told police he fled from the scene by car and that police saw two guns thrown from the fleeing car in which Rosario was eventually apprehended. It is simply a matter of connecting the dots. It seems reasonably probable, from the proposed evidence, that Rosario had with him, and used, two guns at the crime scene, that he fled by car with the guns still in his possession, and that those guns were discarded during the ensuing police chase.

Certainly such a conclusion is not inescapable. It is conceivable that, while both Rosario and the guns were at the murder scene, the guns were in fact used by some other party or parties. After all, the government does not say in its proffer how "involved" in the murder Rosario confessed to being. The guns might have belonged to one of the getaway car's other two passengers, and Rosario might have known nothing of their existence. But "the burden of authentication does not require the proponent of the evidence to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be. Rather, the standard . . . is one of reasonable likelihood." *United States v. Holmquist*, 36 F.3d 154, 168 (1st Cir. 1994); *see also United States v. Ortiz*, 966 F.2d 707, 716 (1st Cir. 1992) ("[Rule 901(a)] does not erect a particularly high hurdle.").

Nevertheless, additional evidence is required for authentication in this case. While the government's proposed evidence establishes a connection between two guns and Rosario, it does nothing to show that the two guns to be offered at trial are the same two guns with which Rosario is connected. If the government introduces only what it has proposed, the court will have no basis for concluding that the two guns the government seeks to admit are the very guns that were seen being thrown from the Yaris, seized by the police, and subjected to ballistics testing, presented in the same condition as when they were seized. In some cases, it might be relatively unimportant whether the physical object admitted at trial is the

same object, or in the same condition, as the one actually linked to a particular party. But the nature of the charged offenses here requires that the government establish such identity.

If the jury is to be able to examine a gun and see its obliterated serial number or machinegun attachment, that specific gun must be shown to be related to the case and in substantially the same condition as when it came into police custody. This is precisely the purpose of chain-of-custody evidence, which serves "to render it improbable that the original item either has been exchanged with another or has been tampered with or contaminated." *Abreu*, 952 F.2d at 1467 (citing Edward W. Cleary et al., McCormick on Evidence § 212 (3d ed. 1984)); *see also* 5 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 9:10 (4th ed. 2014) ("Showing the 'chain of custody' serves the two purposes of insuring that the object offered at trial is the very one connected to the party, transaction, or events, and of providing some assurance that it has not been materially altered between the time of the underlying events and the time of trial.").

The government therefore must provide a tracing of the chain of custody for the guns to be authenticated. Now the question is whether the inconsistency identified by defendants—the government's assertion that the guns were discarded along Road 187 on the one hand, the forensic report stating that the guns were collected from the murder scene on the other—is fatal to the government's ability to make an adequate showing. The answer is no.

Because the jury is the ultimate arbiter of authenticity, the chain of custody for a particular item need not be mapped in perfect detail to survive the court's preliminary evaluation. *See Ladd*, 885 F.2d at 957 ("[T]he prosecution's chain-of-custody evidence must be adequate—not infallible. . . . [T]he net effect of any [deficiencies] on the authenticity of the evidence depend[s] on what inferences a reasonable factfinder may choose to draw from it."). A gap or infirmity in the chain generally "factors into the weight given to the evidence rather than its admissibility." *United States v. Barrow*, 448 F.3d 37, 42 (1st Cir. 2006) (quoting *United States v. Scharon*, 187 F.3d 17, 22 (1st Cir. 1999)); *see also United States v.*

*Myers*, 294 F.3d 203, 210 (1st Cir. 2002) ("The links in a chain of custody need not be welded to one another, but, rather, may be more loosely connected.").

Here, if the government presents chain-of-custody evidence inconsistent with the forensic report's account of the seizure—for example, by calling an officer who testifies to recovering the guns from the side of Road 187—the inconsistency will not preclude the guns' admission. Assuming the government provides a tracing adequate in itself, the effect of the report, if any, is a matter for the jury.

Defendants acknowledge that "issues with the chain of custody of a particular item, ordinarily go to the weight and credibility of that evidence, rather than its admissibility," but argue, citing *United States v. Mejia*, 597 F.3d 1329 (D.C. Cir. 2010), that a gap or other flaw in the chain of custody may be so glaring as to render evidence inadmissible. Mot. ¶ 9. At least one First Circuit case can be read to support that proposition. In *United States v. Ladd*, the defendant was charged with heroin distribution, and the government introduced into evidence the results of two tests, from two different labs, of fluids taken from the body of a man, Massey, who had died after using the defendant's product. 885 F.2d at 955–96. Through robust cross-examination of a chemist employed by the first lab, the defendant attacked the facility's specimen-storage and –handling procedures as hopelessly slipshod, calling into doubt whether the results produced at trial were, as the government claimed, drawn from unaltered samples of Massey's blood and urine. *Id.* at 956. The court held that, though not misdirected, "this cross-examination went to the weight of the evidence, not to its admissibility." *Id.* The court agreed that the defendant had shown "a certain sloppiness, regrettable in a forensic laboratory," but noted that "the net effect of any such disarray on the authenticity of the evidence depended on what inferences a reasonable factfinder might choose to draw from it." *Id.* at 957.

The results from the second lab were a different story. Upon receipt of Massey's fluid samples, the first lab assigned each an identification number. *Id.* After initial testing, a blood sample—Massey's, according to the government—was forwarded from the first lab to

the second. *Id.* The sample received and tested by the second lab, however, bore an identification number off by one digit from that initially assigned to Massey's. *Id.* This discrepancy was not explained, and the government made no real effort to alleviate its effects. *Id.* It did not, for instance, present the testimony of the first lab employee who released the sample, of the courier who delivered it, or of the second lab employee who received it. *Id.* And, though the incorrect number was at some point manually corrected, no evidence was presented "as to when, where, how or why this emendation occurred." *Id.* There was thus "no competent evidence" showing that the sample tested by the second lab was the same one taken from Massey and tested by the first lab. *Id.* The "linkage" in the chain of custody, the court held, "was not merely rusted—it had parted," and the results should not have been admitted into evidence. *Id.*

This case is distinguishable from the discussion of the second lab report in *Ladd*. There, the government apparently presented no authentication evidence other than the identification number recorded by the second lab upon receipt of the sample tested. Because the number was clearly not that assigned to the correct sample, there was, in effect, no evidence at all establishing the tested sample's chain of custody. In recounting the steps the government failed to take to mitigate the effect of the discrepancy, the court suggested that the outcome would have been different had there been positive chain-of-custody evidence or evidence explaining the incorrect number. Here, as discussed, the government must provide chain-of-custody evidence to authenticate the guns, and the government has stated in its opposition that the chain of custody detailed by the forensic report is inaccurate; it can therefore be assumed that the government will present chain-of-custody evidence other than the report itself.[3] If met with competent contradictory evidence and explained as an error, the forensic report would not bar a finding of authenticity. In *United States v. Morales*, for example, the court found that, despite a discrepancy between the number of vials of crack

---

[3] If it fails to do so, the guns will be inadmissible for the reasons discussed above, not because of the report.

United States v. Rosado-Cancel, Criminal No. 13-0731 (DRD/BJM)                                                                 10

listed on a lab's transmittal sheet and the number of vials introduced at trial, the vials were properly authenticated. No. 95-1616, slip op. at 3 (1st Cir. July 12, 1996) (unpublished). In light of testimony that the transmittal sheet was incorrect and that, in fact, the same number of vials were seized and tested as were introduced at trial, the court held that the discrepancy went only to the weight of the evidence. *Id.*

The government may not be able to authenticate the guns at trial. But despite the conflicting evidence as to where the guns were seized, a finding of authenticity is possible, provided that the government makes a sufficient showing that the guns are what it claims them to be. I therefore recommend that the court deny defendants' motion to exclude the guns on authentication grounds and, pursuant to Rule 104(b), admit the guns conditionally, subject to the government's production at trial of the evidence proposed in its opposition, as well as adequate chain-of-custody evidence, such as testimony of the officer who retrieved the guns from the roadside.

## II.     Due Process

Defendants' due process argument is essentially identical to their authentication argument. They contend that the forensic report's account of the seizure and the government's apparent theory of the case, according to which defendants discarded the guns along Road 187, are fundamentally inconsistent. Thus, they say, the evidence connecting them to the guns is unreliable, and the guns should not be admitted.

Defendants provide no authority for the proposition that such concerns may be addressed through an appeal to due process. Puzzlingly, they cite only *Perry v. New Hampshire*, 132 S. Ct. 716 (2012), which in fact strongly suggests that their argument is not of constitutional magnitude. In *Perry*, the Supreme Court noted that the introduction of evidence very rarely implicates the Due Process Clause. 132 S. Ct. at 723. "[S]tate and federal statutes and rules ordinarily govern the admissibility of evidence, and juries are assigned the task of determining the reliability of the evidence presented at trial." *Id.* The Court has imposed an evidentiary restraint founded in the Due Process Clause "[o]nly when

evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.'" *Id.* (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).  In a series of prior decisions, the Court established that eyewitness identification evidence meets that standard where the police employed a suggestive and unnecessary identification procedure that results in a substantial likelihood of misidentification.  *Id.* at 724.  The *Perry* Court declined to extend the embrace of the Due Process Clause to eyewitness identifications that are unreliable for reasons other than improper police conduct, expressing reluctance to subject additional evidentiary rulings to due process scrutiny and confidence that existing safeguards, including rules of evidence, provide adequate protection against unreliable evidence.  *Id.* at 725–29.

"Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation," and the Supreme Court has therefore "defined the category of infractions that violate 'fundamental fairness' very narrowly."  *Dowling*, 493 U.S. at 352.  The Court has not held that the introduction of inauthentic physical evidence violates fundamental fairness, and for that reason defendants' motion to suppress on due process ground should be denied.  The Federal Rules of Evidence serve to protect against the admission of unreliable physical evidence; the Due Process Clause does not provide a similar service.

## CONCLUSION

For the reasons above, the motion should be **DENIED**.  The guns that defendants seek to exclude should be conditionally admitted, subject to the introduction at trial of the evidence already proffered by the government and evidence of the chain of custody for the guns.

This report and recommendation is filed pursuant to 28 U.S.C. 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court.  Any objections to the same must be specific and must be filed with the Clerk of Court **within 14 days** of its receipt.  Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate

review.  *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**
In San Juan, Puerto Rico, this 14th day of January, 2015.

*S/ Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge